# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| STEPHEN BUSHANSKY, On Behalf of Himself and All Others Similarly Situated, | Case No.: 18-cv-00648 |
| Plaintiff, | |
| vs. | **CLASS ACTION COMPLAINT** |
| LA QUINTA HOLDINGS INC., KEITH A. CLINE, MITESH B. SHAH, JAMES R. ABRAHAMSON, GLENN ALBA, SCOTT O. BERGREN, ALAN J. BOWERS, HENRY G. CISNEROS, GIOVANNI CUTAIA, BRIAN KIM, and GARY M. SUMERS, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Stephen Bushansky ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this class action on behalf of the public stockholders of La Quinta Holdings Inc. ("La Quinta" or the "Company") against La Quinta and the members of its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which La Quinta will be acquired by Wyndham Worldwide Corporation ("Wyndham") through Wyndham's wholly-

owned subsidiary WHG BB Sub, Inc. ("Merger Sub") (the "Proposed Transaction").

2.      On January 18, 2018, La Quinta and Wyndham issued a joint press release announcing they had entered into an Agreement and Plan of Merger (the "Merger Agreement") to sell La Quinta's hotel franchise and hotel management business to Wyndham for $8.40 in cash per La Quinta common share (the "Merger Consideration"). La Quinta will also effect a reclassification and combination of La Quinta common stock at a ratio of 1-for-2 and will amend the par value of the La Quinta common stock from $0.01 per share to $0.02 per share. The Proposed Transaction is valued at approximately $1.95 billion.

3.      In connection with the Proposed Transaction, La Quinta and CorePoint Lodging, Inc. ("CorePoint") entered into a Separation and Distribution Agreement dated January 17, 2018 (the "Separation Agreement"), pursuant to which, immediately prior to the merger, La Quinta will effect a separation of its real estate assets and certain related assets and liabilities, which will be conveyed to and vest in CorePoint, followed by a pro rata distribution to La Quinta stockholders of common stock representing 100% of the interest in CorePoint.

4.      On February 22, 2018, La Quinta filed a Preliminary Proxy Statement on Schedule 14A (the "Proxy Statement") with the SEC. The Proxy Statement, which recommends that La Quinta stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) potential conflicts of interest faced by La Quinta insiders and the Company's financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan"); (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by J.P. Morgan; and (iii) the background process leading up to the Proposed Transaction. The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as La Quinta stockholders need such

information in order to cast a fully-informed vote in connection with the Proposed Transaction or seek appraisal.

5.      In short, unless remedied, La Quinta's public stockholders will be forced to make a voting or appraisal decision on the Proposed Transaction without full disclosure of all material information concerning the Proposed Transaction being provided to them. Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

7.      This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists. La Quinta is headquartered in this District. Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

9.      Plaintiff is, and has been continuously throughout all times relevant hereto, the

owner of La Quinta common stock.

10.    La Quinta is a Delaware corporation and maintains its principal executive offices at 909 Hidden Ridge, Suite 600, Irving, Texas 75038. La Quinta is an owner, operator and franchisor of select-service hotels. La Quinta's common stock is traded on the New York Stock Exchange under the ticker symbol "LQ."

11.    Defendant Keith A. Cline ("Cline") has been President and Chief Executive Officer ("CEO") of the Company since February 18, 2018 after serving as interim President and CEO since September 15, 2015. Defendant Cline has been a director of the Company since September 2015.

12.    Defendant Mitesh B. Shah ("Shah") has been Chairperson of the Board since November 2014, a director of the Company since February 2014, and a director of certain of La Quinta's predecessor entities since 2013.

13.    Defendant James R. Abrahamson ("Abrahamson") has been a director of the Company since November 2014.

14.    Defendant Glenn Alba ("Alba") has been a director of the Company since 2013 and a director of certain of the Company's predecessor entities since 2006. Defendant Alba is a former Managing Director in the Real Estate Group of The Blackstone Group L.P. ("Blackstone").

15.    Defendant Scott O. Bergren ("Bergren") has been a director of the Company since June 2015.

16.    Defendant Alan J. Bowers ("Bowers") has been a director of the Company since February 2014 and a director of certain of the Company's predecessor entities since 2013.

17.    Defendant Henry G. Cisneros ("Cisneros") has been a director of the Company

since February 2014 and a director of certain of the Company's predecessor entities since 2013.

18.    Defendant Giovanni Cutaia ("Cutaia") has been a director of the Company since November 2014. Defendant Cutaia is a Senior Managing Director and Co-Head of Global Asset Management in the Real Estate Group of Blackstone.

19.    Defendant Brian Kim ("Kim") has been a director of the Company since November 2014. Defendant Kim is a Managing Director in the Real Estate Group of Blackstone.

20.    Defendant Gary M. Sumers ("Sumers") has been a director of the Company since February 2014. Defendant Sumers is a former Senior Managing Director and Chief Operating Officer in the Real Estate Group of Blackstone.

21.    The defendants identified in paragraphs 10 through 20 are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

22.    Wyndham is a Delaware corporation, with its principal executive offices located at 22 Sylvan Way, Parsippany, New Jersey 07054. Wyndham is one of the largest global hospitality companies, providing travelers with access to hotels, vacation ownership and unique accommodations. Wyndham's common stock is traded on the New York Stock Exchange under the ticker symbol "WYN."

23.    Merger Sub is a Delaware corporation and an indirect wholly-owned subsidiary of Wyndham.

24.    CorePoint is a real estate investment trust and newly formed subsidiary of La Quinta. Immediately prior to the sale of La Quinta to Wyndham, La Quinta will spin off its owned real estate assets into CorePoint.

25.    Blackstone is a global investment firm focused on private equity, real estate,

public debt and equity, non-investment grade credit, real assets and secondary funds, with approximately $434 billion of assets under management. As of January 17, 2018, Blackstone owned approximately 29.97% of La Quinta's common stock.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own La Quinta common stock (the "Class"). Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

27.     This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure. The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. As of February 20, 2018, there were approximately 117,342,020 shares of La Quinta common stock outstanding. All members of the Class may be identified from records maintained by La Quinta or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

28.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)    Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

29.    Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

30.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

31.    Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

32.    La Quinta owns, operates and franchises select-service hotels primarily serving the upper-midscale and midscale segments. From 1973 to January 2006, the Company operated through its predecessors as a public company. In January 2006, La Quinta was acquired by Blackstone. Over the next ten years, the Company expanded its franchise system by over three times. As of December 31, 2016, the Company's portfolio consisted of 888 hotels representing approximately 87,200 rooms in 48 states across the U.S., as well as in Canada, Mexico, Honduras and Colombia, of which 322 hotels were owned and operated and 566 were franchised. La Quinta also has a pipeline of 248 future franchised hotels to be located in the U.S., Mexico, Colombia, Nicaragua, Guatemala, Chile and El Salvador, 90% of which represent new construction.

33.    The Company operates its business across two segments: owned hotels and franchise and management. Generally, La Quinta's owned hotels include the land, related easements and rights, buildings, improvements, furniture, fixtures and equipment. The Company owns, operates and franchises all of its hotels under the La Quinta Inn, La Quinta Inn & Suites, and LQ Hotel trademarks.

34.    On November 1, 2017, La Quinta issued a press release announcing its third quarter 2017 financial results. For the quarter, the Company grew system-wide comparable revenue per available room ("RevPAR") 2.9% compared to the third quarter of 2016. The Company grew franchise and other fee-based revenue 9.4% compared to the third quarter of 2016, and reported its fifth consecutive quarter of market share growth. Defendant Cline commented on the quarter's financial results, stating:

> La Quinta's third quarter results demonstrate the momentum we are building in our business, as we execute on our key strategic initiatives to deliver a consistent product, to consistently deliver an outstanding guest experience and to drive engagement with our brand. We saw impressive gains in RevPAR and guest satisfaction scores this quarter, which resulted in our fifth consecutive quarter of market share gains. . . . We completed the renovation of eight additional hotels in our repositioning program during the third quarter and continue to be encouraged by the positive response from our guests. We also added to a strong pipeline that will allow us to further expand our reach into new markets and take advantage of our unique growth opportunity in the industry.

**The Sale Process**

35.    During 2015 and 2016, La Quinta engaged in preliminary discussions with a number of third parties regarding a potential strategic transaction. On November 29, 2016, a party referred to in the Proxy Statement as "Bidder 2" submitted an indication of interest to acquire La Quinta as a whole in a proposed transaction for cash and stock consideration.

36.    On January 18, 2017, La Quinta issued a press release announcing its intention to pursue the separation of its businesses into two stand-alone publicly traded companies, which

would involve spinning off its real estate assets as a separately traded public company.

37.    Also on January 18, 2017, the Company and J.P. Morgan entered into an engagement letter pursuant to which J.P. Morgan would act as the Company's financial advisor in connection with the CorePoint spin-off and certain other strategic alternatives involving the Company.

38.    Following the Company's January 18, 2017 announcement, La Quinta received several inquiries from parties potentially interested in acquiring the Company's management and franchise businesses that would continue to be contained in the existing publicly traded company ("New La Quinta"), each of which was informed it was possible La Quinta would be interested in exploring potential sale alternatives with respect to New La Quinta after the CorePoint Form 10 registration statement (the "Form 10") was filed with the SEC relating to the CorePoint spin-off. These parties included Wyndham, Bidder 2 and a party referred to in the Proxy Statement as "Bidder 3."

39.    LaQuinta caused CorePoint to file the Form 10 with the SEC on July 26, 2017.

40.    Beginning in early September 2017, J.P. Morgan contacted 14 parties and invited them to participate in La Quinta's auction process for the potential sale of New La Quinta upon consummation of the CorePoint spin-off. Six of the parties entered into confidentiality agreements with La Quinta, including Wyndham, Bidder 2, and Bidder 3, and engaged in due diligence.

41.    At an October 19, 2017 Board meeting, representatives of J.P. Morgan provided a preliminary overview of various financing alternatives for CorePoint in connection with the potential spin-off transaction, including a commercial mortgage-backed securities ("CMBS") financing and a leveraged loan structure, and a leveraged loan structure for New La Quinta.

42.     By October 30, 2017, three of the six parties who had entered into confidentiality agreements (Wyndham, Bidder 2, and Bidder 3) submitted first round proposals. According to the Proxy Statement, "[t]he proposed enterprise values of [the bids submitted by Wyndham and Bidder 2] were close, with the highest value proposal being $1.6 billion." Proxy Statement at 44. The Proxy Statement fails to disclose the economic terms of the individual proposals.

43.     Between November 20, 2017 and December 4, 2017, at the request of the Company, J.P. Morgan's commercial banking affiliate, JPMorgan Chase Bank, N.A. ("JP Morgan Chase Bank"), prepared and provided to the Company proposed financing documents for a leveraged loan financing structure. Representatives of the Company's management, La Quinta's legal advisor and JPMorgan Chase Bank negotiated these documents throughout December 2017 and the beginning of January 2018.

44.     On January 4, 2018, each of Wyndham and Bidder 2 submitted revised proposals to representatives of J.P. Morgan. Wyndham's proposal provided for an enterprise value of $1.85 billion. The Proxy Statement fails to disclose the enterprise value contemplated in Bidder 2's proposal.

45.     At a January 8, 2018 Board meeting, the Board discussed the two proposals and determined to allow Wyndham an opportunity to make a substantial improvement to its proposal and, if made, to thereafter work to negotiate a definitive merger agreement and related documents with Wyndham.

46.     On January 9, 2018, J.P. Morgan invited Wyndham to submit a revised proposal within 24 hours. The next day, Wyndham submitted a revised proposal reflecting a total enterprise value of $1.95 billion. J.P. Morgan subsequently informed Bidder 2 that La Quinta was moving forward with another bidder.

47.    In connection with obtaining committed financing for CorePoint, which was contemplated by the draft merger agreement, the Company had requested that representatives of Blackstone, the Company's largest stockholder, review the proposed terms of the CorePoint financing being provided by JPMorgan Chase Bank. On January 13, 2018, representatives of Blackstone informed the Company that following its review Blackstone believed that a CMBS financing structure would be economically advantageous to La Quinta stockholders as compared to the leveraged loan financing structure that was then being pursued by La Quinta on behalf of CorePoint. Representatives of Blackstone also informed La Quinta that certain affiliates of Blackstone would be prepared to provide CorePoint committed financing using a CMBS financing structure. La Quinta senior management subsequently contacted representatives of JPMorgan Chase Bank to request a proposal to the Company with respect to a CMBS financing structure.

48.    At a January 15, 2018 Board meeting, the Company's representatives updated the Board about the status of the negotiation of the final terms for the CorePoint financing commitments and members of La Quinta management reported they believe La Quinta, on behalf of CorePoint, should move forward with the CMBS financing structure. Representatives of La Quinta management further reported that they informed representatives of JPMorgan Chase Bank that certain affiliates of Blackstone would be willing to participate in the financing with respect to a portion of such financing expected to be no greater than 50% and to participate in the revolving credit facility.

49.    From January 15 through January 17, 2018, the Company's legal advisor negotiated to finalize the terms of the CorePoint financing with JP Morgan Chase Bank.

50.    At a January 17, 2018 Board meeting, J.P. Morgan rendered its fairness opinion.

Also at the January 17, 2018 Board meeting, defendants Shah, Abrahamson, Bergren and Bowers updated the Board on their discussions regarding the CorePoint financing commitments and reported that JPMorgan Chase Bank was prepared to enter into arrangements with certain affiliates of Blackstone to permit their participation in the financing, including in the related revolving credit facility.

51.     Later that day, the Company and Wyndham executed the Merger Agreement.

**The Proposed Transaction**

52.     On January 18, 2018, Wyndham and La Quinta issued a joint press release announcing the Proposed Transaction. The press release stated, in relevant part:

> PARSIPPANY, NJ and IRVING, TX, January 18, 2018—Wyndham Worldwide Corporation (NYSE: WYN) and La Quinta Holdings Inc. (NYSE: LQ) announced today that they have entered into a definitive agreement under which Wyndham Worldwide will acquire La Quinta's hotel franchise and hotel management businesses for $1.95 billion in cash. The acquisition is expected to close in the second quarter of 2018.

> Under the terms of the agreement, stockholders of La Quinta will receive $8.40 per share in cash (approximately $1.0 billion in aggregate), and Wyndham Worldwide will repay approximately $715 million of La Quinta debt net of cash and set aside a reserve of $240 million for estimated taxes expected to be incurred in connection with the taxable spin-off of La Quinta's owned real estate assets into CorePoint Lodging Inc. Immediately prior to the sale of La Quinta to Wyndham Worldwide, La Quinta will spin off its owned real estate assets into a publicly-traded real estate investment trust, CorePoint Lodging.

> Wyndham's Hotel Group is the world's largest and most diverse hotel business based on number of properties. With the acquisition of La Quinta's asset-light, fee-for-service business consisting of nearly 900 managed and franchised hotels, Wyndham Hotel Group will span 21 brands and over 9,000 hotels across more than 75 countries.

> The addition of La Quinta, one of the largest midscale brands in the industry, will build upon Wyndham Hotel Group's strong midscale presence, expand its reach further into the fast-growing upper-midscale segment, and position Wyndham Hotel Group to be the preferred partner and accommodations provider of developers and guests. The La Quinta Returns®loyalty program, with its 13 million enrolled members, will be combined with the award-winning Wyndham Rewards® program, with its 53 million enrolled members.

Stephen P. Holmes, Chairman and Chief Executive Officer of Wyndham Worldwide, said, "This transaction builds on Wyndham Worldwide's proven track record of acquiring companies that are a strong strategic and cultural fit, add highly-regarded brands to our portfolio and offer clear opportunities to drive shareholder value through growth, shared best practices and sharp execution."

"La Quinta will immediately become one of our flagship brands," said Geoff Ballotti, President and Chief Executive Officer of Wyndham Hotel Group. "It is an exceptionally strong brand that is led by service-minded associates who deliver some of the highest customer engagement levels in our industry. We expect that La Quinta guests and franchisees will benefit from our intense focus on product quality and our best-in-class technology, digital, loyalty and distribution platforms. This acquisition also significantly expands our hotel management business and provides us with substantial new opportunities to drive increased growth in our business."

Keith Cline, President and Chief Executive Officer of La Quinta, added, "As we anticipated, the separation of our businesses is enabling greater strategic clarity and allowing our company to take advantage of growth opportunities that naturally flow from each business model. To that end, we are excited to announce the addition of the La Quinta franchise and management businesses to Wyndham Hotel Group's portfolio. We believe that, under the management of Wyndham's seasoned team of executives, the La Quinta portfolio will grow and thrive, yielding long-term benefits to the stakeholders of both companies."

The transaction, which has been approved by the boards of directors of both companies, is expected to close upon the completion of the planned spin-off of La Quinta's owned real estate assets into the separate entity. Closing is subject to approval by La Quinta stockholders, regulatory and government approval and the satisfaction of other customary closing conditions. Additional information about the transaction will be available on the companies' investor relations websites, investor.wyndhamworldwide.com and ir.lq.com.

La Quinta also announced today that Keith A. Cline has been appointed President and Chief Executive Officer of CorePoint Lodging effective upon completion of the planned spin-off.

Wyndham Worldwide's planned spin-off of Wyndham Hotel Group remains on track for an expected distribution in the second quarter of 2018.

## Insiders' Interests in the Proposed Transaction

53.     La Quinta insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and La Quinta's public stockholders.

54. Notably, defendant Cline has secured a position for himself upon completion of the Proposed Transaction as President and CEO of CorePoint effective upon completion of the planned spin-off.

55. La Quinta insiders stand to reap substantial financial benefits for securing the deal with Wyndham. Each outstanding Company restricted stock awards and restricted stock units will automatically vest and be converted into the right to receive cash payments, as set forth in the following tables:

| Executive Officer | Shares of La Quinta Common Stock Underlying La Quinta RSAs (#) | Value ($) |
|---|---|---|
| *Named Executive Officers* | | |
| Keith A. Cline | 133,826 | 2,194,746.40 |
| *President and Chief Executive Officer* | | |
| James H. Forson | 39,695 | 650,998.00 |
| *Executive Vice President, Chief Financial Officer and Treasurer* | | |
| John W. Cantele | 38,974 | 639,173.60 |
| *Executive Vice President and Chief Operating Officer* | | |
| Rajiv K. Trivedi | 63,288.50 | 1,037,931.40 |
| *Executive Vice President and Chief Development Officer* | | |
| Mark M. Chloupek | 45,326 | 743,346.40 |
| *Executive Vice President, Secretary and General Counsel* | | |
| *Other Executive Officers* | 16,978.50 | 278,447.40 |
| **Total** | 338,088 | 5,544,643.20 |

| Director | La Quinta RSUs (#) | Value ($) | Value of Dividend Equivalents ($) |
|---|---|---|---|
| James R. Abrahamson | 6,941 | 113,832.40 | — |
| Glenn Alba | 1,732.50 | 28,413.00 | — |
| Scott Bergren | 7,088.50 | 116,251.40 | — |
| Alan J. Bowers | 7,088.50 | 116,251.40 | — |
| Henry G. Cisneros | 7,088.50 | 116,251.40 | — |
| Giovanni Cutaia | — | — | — |
| Brian Kim | — | — | — |
| Mitesh B. Shah | 10,667 | 174,938.80 | — |
| Gary M. Sumers | 7,088.50 | 116,251.40 | — |
| **Total** | 47,694.50 | 782,189.80 | — |

56.     Further, if they are terminated in connection with the Proposed Transaction, La Quinta's named executive officers stand to receive substantial cash severance payments in the form of golden parachute compensation, as set forth in the following table:

| Name | Cash(1)(2)($) | Equity(3) ($) | Perquisites / Benefits(4) ($) | Tax Reimbursements ($)(5) | Other ($)(6) | Total ($)(7)(8) |
|---|---|---|---|---|---|---|
| Keith A. Cline | — | 3,633,837 | — | — | — | 3,633,837 |
| James H. Forson | 1,912,500 | 2,304,187 | 43,364 | — | 300,000 | 4,560,051 |
| John W. Cantele | 2,227,500 | 2,290,204 | 48,198 | — | 356,250 | 4,922,152 |
| Rajiv K. Trivedi | 2,227,500 | 3,396,592 | 48,198 | — | 235,000 | 5,907,290 |
| Mark M. Chloupek | 1,800,000 | 2,213,898 | 41,432 | 391,083 | 365,000 | 4,811,414 |

## The Proxy Statement Contains Material Misstatements and Omissions

57.     The defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to La Quinta's stockholders. The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote their shares in favor of the Proposed Transaction or seek appraisal.

58.     Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) J.P. Morgan's and La Quinta insiders' potential conflicts of interest; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by J.P. Morgan; and (iii) the background process leading to the Proposed Transaction. Accordingly, La Quinta stockholders are being asked to vote in favor of the Proposed Transaction or seek appraisal without all material information at their disposal.

### Material Omissions Concerning J.P. Morgan's and La Quinta Insiders' Potential Conflicts of Interest

59.     The Proxy Statement fails to disclose material information concerning the

potential conflicts of interest faced by J.P. Morgan and La Quinta insiders in acting as the Company's financial advisor.

60.    In connection with La Quinta's entry into the Merger Agreement, CorePoint entered into a commitment letter (the "Debt Commitment Letter") with J.P. Morgan's commercial banking affiliate, JPMorgan Chase Bank, pursuant to which J.P. Morgan Chase Bank committed, subject to customary conditions, to provide CorePoint with $1.085 billion in secured debt financing. Pursuant to the Debt Commitment Letter, JP Morgan Chase Bank will receive approximately $11.35 million in connection with the financing.

61.    Although J.P. Morgan served as the Company's exclusive financial advisor in connection with the sale process and provided the only fairness opinion La Quinta received in connection with the Proposed Transaction, the Proxy Statement fails to disclose when JP Morgan Chase Bank was selected to finance CorePoint in connection with the merger and spin-off and what other alternative financing sources, if any, the Board considered in evaluating financing options for the Proposed Transaction.

62.    Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

63.    Moreover, the Proxy Statement fails to disclose potential conflicts of interest concerning Blackstone, the Company's largest stockholder, owning approximately 30% of the Company's outstanding shares, which has two current employees (defendants Cutaia and Kim) and two former employees (defendants Alba and Sumers) on the Board.

64.    With respect to the January 15, 2018 Board meeting, the Proxy Statement sets forth:

> Representatives of La Quinta management also reported that they informed representatives of JPMorgan Chase Bank that certain affiliates of Blackstone would be willing to participate as a non-controlling party in the financing with respect to a portion of such financing expected to be no greater than 50% and that certain affiliates of Blackstone also would be prepared to participate in the revolving credit facility, which would provide CorePoint with an increased revolving credit facility beyond that which JPMorgan Chase Bank was prepared to provide on its own.

Proxy Statement at 50.

65.     At the January 17, 2018 Board meeting, defendants Shah, Abrahamson, Bergren and Bowers informed the Board "that, following discussions, JPMorgan Chase Bank was prepared to enter into arrangements with certain affiliates of Blackstone to permit their participation in the financing, including in the related revolving credit facility." Proxy Statement at 51.

66.     The Proxy Statement further discloses:

> In connection with JPMorgan Chase Bank's provision of the CorePoint financing pursuant to the CorePoint financing commitments, JPMorgan Chase Bank may, in its sole discretion, agree to enter into certain arrangements with certain affiliates of Blackstone, pursuant to which affiliates of Blackstone may participate in the CorePoint financing on a non-controlling basis with respect to a portion thereof expected to be no greater than 50% and, in exchange for such participation, may receive from JPMorgan Chase Bank a portion of the fees payable by CorePoint to JPMorgan Chase Bank pursuant to the CorePoint financing commitments.

Proxy Statement at 64. However, the Proxy Statement fails to disclose the fees that Blackstone expects to receive from the debt financing or the details of any fee agreements between J.P. Morgan Chase Bank and Blackstone in connection with the debt financing. Notably, on December 29, 2017, Wyndham indicated that it would expect Blackstone to enter into a voting agreement in connection with a potential transaction, which Blackstone and Wyndham executed following the execution of the Merger Agreement by La Quinta and Wyndham.

67.     This information is necessary for stockholders to understand potential conflicts

of interest of the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

68.     The omission of this information renders the statements in the "Background of the Merger" and "Interests of La Quinta's Executive Officers and Directors in the Merger" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning J.P. Morgan's Financial Analyses***

69.     Further, the Proxy Statement describes J.P. Morgan's fairness opinion and the various valuation analyses performed in support of its opinion. However, the description of J.P. Morgan's fairness opinion and analyses fails to include key inputs and assumptions underlying its analyses. Without this information, as described below, La Quinta's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on J.P. Morgan's fairness opinion in determining whether to vote in favor of the Proposed Transaction or seek appraisal. This omitted information, if disclosed, would significantly alter the total mix of information available to La Quinta's stockholders.

70.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) unlevered free cash flow of New La Quinta during the terminal period; (ii) J.P. Morgan's basis for applying a terminal value growth rate ranging from 3.0% to 3.5%; (iii) the inputs and assumptions underlying the discount rate range of 7.75% to 8.25%; (iv) whether J.P. Morgan treated stock-based compensation as a cash expense in its analysis, (v) quantification of the Company's stock-based compensation, if J.P. Morgan treated stock-based compensation as a cash expense; and (vi) the implied terminal multiples resulting from the analysis.

71.     When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

72.     The omission of this information renders the statements in the "Opinion of J.P. Morgan Securities LLC" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning the Background Process of the Proposed Transaction***

73.     The Proxy Statement omits material information relating to the sale process leading up to the Proposed Transaction.

74.     According to the Proxy Statement, representatives of J.P. Morgan received first round preliminary proposals for an acquisition of New La Quinta from three parties (Wyndham, Bidder 2 and Bidder 3) by October 30, 2017, and revised proposals from two parties (Wyndhan and Bidder 2) on January 4, 2018. The Proxy Statement however fails to disclose the actual economic and other terms proposed by Wyndham and Bidder 2 during the first round and by Bidder 2 during the second bid deadline. La Quinta stockholders are entitled to understand what offers were made to and rejected by La Quinta so that they can assess for themselves whether the Proposed Transaction with Wyndham is the best transaction possible.

75.     The omission of this information renders the statements in the "Background of the Merger" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

76.     The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement. Absent disclosure of the foregoing material information prior to the stockholder vote

on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed voting and appraisal decision in connection with the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## COUNT I

### Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder

77.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

78.     During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

79.     By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement. The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants. It misrepresented and/or omitted material facts, including material information about and potential conflicts of interest faced by the Company's banker and Company insiders, the sales process for the Company, and the financial analyses performed by the Company's financial advisor. The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

80.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction or whether to seek appraisal.

81.     By reason of the foregoing, defendants violated Section 14(a) of the Exchange

Act and SEC Rule 14a-9 promulgated thereunder.

82.    Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Class Claims Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act

83.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

84.    The Individual Defendants acted as controlling persons of La Quinta within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of La Quinta and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

85.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

86.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous

recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of the Proxy Statement.

87.    In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

88.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

89.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' conduct, La Quinta's stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of La Quinta, and against defendants, as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.    Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction

and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to La Quinta stockholders;

      C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

      D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

      E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

      F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: March 19, 2018           Respectfully Submitted,

     */s/ William B. Federman*
     William B. Federman
     Texas Bar No. 00794935
     **FEDERMAN & SHERWOOD**
     2926 Maple Ave., Suite 200
     Dallas, Texas 75201
     Telephone: (214) 696-1100
     Facsimile: (214) 740-0112
     Email: wbf@federmanlaw.com

     *Attorneys for Plaintiff*

OF COUNSEL:

**WEISSLAW LLP**
Richard A. Acocelli
*Pro Hac Vice To Be Filed*
1500 Broadway, 16th Floor
New York, New York 10036
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: racocelli@weisslawllp.com